[No. E029908. Fourth Dist., Div. Two. May 9, 2003.]

MICHAEL PARK, Plaintiff and Respondent, v.
BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY,
Defendant and Appellant.

**COUNSEL**

Haight, Brown & Bonesteel, Roy G. Weatherup, Jon M. Kasimov, J. Alan Warfield; Kinkle, Rodiger & Spriggs and Bruce E. Disenhouse for Defendant and Appellant.

Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, David J. Cooper, Ned E. Dunphy, Catherine E. Bennett; Law Offices of John C. Hall and John C. Hall for Plaintiff and Respondent.

**OPINION**

**HOLLENHORST, Acting P. J.**—Plaintiff Michael Park, an employee of Consolidated Waste Industries, Inc. (Consolidated), was seriously injured when a 55-gallon drum exploded. The drum contained used nickel iron batteries from defendant Burlington Northern Santa Fe Railway Company (Burlington). Burlington had employed Consolidated, a hazardous waste disposal company, to dispose of the batteries. After a lengthy jury trial, the jury found against Burlington and awarded plaintiff Park $1,250,000 in economic damages and $500,000 in noneconomic damages.

Burlington appeals, contending the judgment violates California law as stated in *Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72,

854 P.2d 721], *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504], and related cases. Alternatively, it contends that the trial court erred in the admission of evidence, and the jury awarded damages that are not supported by substantial evidence.

We agree with Burlington's first contention and reverse the judgment.

FACTS

Consolidated is in the business of transporting hazardous waste to a disposal site. Plaintiff Park was employed by Consolidated as a truck driver. On April 27, 1998, he was in the process of unloading plastic 55-gallon drums at Consolidated's yard in Montclair when a drum exploded, causing serious personal injuries. The drum that exploded contained waste signal batteries that had been collected several days earlier from a Burlington site in Merced.

On April 28, 1994, Consolidated and Burlington entered into a contract that provided that Consolidated would remove hazardous materials from locations specified by Burlington's predecessor company. Generally, Burlington employees would remove the batteries from signal boxes by cutting the battery cables. Burlington employees would then stack the batteries in containers or on pallets at various Burlington yard locations. Pursuant to the contract, Consolidated would send a crew to those locations to pick up hazardous material, including used batteries.

On April 21, 1998, a Consolidated employee, Dennis McEntee, went to Burlington's Merced yard, picked up batteries packed in plastic totes and repacked them into 55-gallon drums. He and his crew did not remove the leads from the batteries.[1] Consolidated then transported the drums of hazardous material to its yard in Montclair for processing and further transportation to hazardous waste disposal facilities.

Mr. McEntee signed a hazardous waste manifest on behalf of Burlington when he picked up the batteries. It was his understanding that the railroad had authorized him to do so. Burlington was the generator of the hazardous waste, and the manifest was the required certification that everything had been done for the proper packing and shipping of the hazardous material. Thus, when Mr. McEntee signed the manifest, he signed it as an agent for

---

[1]The truck driver testified that they always removed the leads from the batteries with the exception of the subject batteries. According to the driver, the leads were not removed from the subject batteries because Mr. McEntee was in a hurry that day. A Consolidated supervisor testified that he told Mr. McEntee to always remove the leads from the batteries.

Burlington, and he was certifying that the drums were safe for transport on the highway. Consolidated's truck driver then signed the form as the transporter of the hazardous waste.

The parties stipulated that (1) the batteries were packaged on April 21, 1998; (2) they were then transported to Consolidated's yard, arriving on April 23, 1998; and (3) they sat in the trailer until the accident occurred on April 27, 1998.

Mr. Park was moving a barrel when it exploded. Mr. Park's jaw was broken in four places and his chin was blown off. A dentist specializing in jaw injuries testified as to the nature and extent of Mr. Park's injuries and his needs for future treatment. A vocational rehabilitation counselor also testified concerning his injuries and job prognosis. The parties stipulated that Mr. Park was paid $93,366.44 in worker's compensation benefits.

The jury rendered a special verdict. It found that Burlington was 33 percent responsible for Mr. Park's injuries, Consolidated was 67 percent responsible, Mr. Park's economic damages were $1,250,000 and his noneconomic damages were $500,000, for a total of $1,750,000. Since Consolidated's liability is limited to workers' compensation benefits, the entire burden of the judgment falls on Burlington.

Burlington appeals.

## ISSUES

As noted above, Burlington's primary contention is that it is entitled to judgment in its favor as a matter of law because, under *Privette* and its progeny, it cannot be held liable for injuries to an employee of its independent contractor.

Second, Burlington contends that the judgment cannot be upheld on an agency theory. Under this heading, Burlington argues that plaintiff Park failed to allege an agency theory in his complaint, failed to move to amend to conform to proof, and that the jury's special findings on the agency issue do not support the judgment.

Third, Burlington argues that the trial court erred in upholding the jury's verdict on the basis of the nondelegable duty doctrine. Burlington points out the trial court had rejected this theory of liability during trial and had refused to submit it to the jury. However, after trial, the trial court accepted the theory in support of the judgment.

Fourth, Burlington contends that the jury's finding that Burlington's negligence caused plaintiff's injuries is unsupported by substantial evidence.

Fifth, Burlington contends it is entitled to judgment as a matter of law by application of the doctrine of primary assumption of risk.

Sixth, Burlington argues several errors were made in the admission of certain testimony of plaintiff's expert witness, Richard Casagrande.

Seventh, Burlington argues the trial court erred in admitting evidence of a similar prior incident in which another Consolidated employee, Jesus Garcia, was injured.

Eighth, Burlington argues that the trial court erred in allowing plaintiff's nondesignated dental expert to give opinions regarding the need for future medical and dental care.

Ninth, Burlington contends the special verdict form was defective and that it led to vague, ambiguous and inconsistent findings.

Tenth, Burlington argues that the jury's award of more than $1.1 million in compensatory damages is excessive, speculative, and not based on the evidence.

Mr. Park asserts that, "[a]t every stage, the essence of the parties' dispute centered upon the nature, scope, and propriety of [Burlington's] asserted 'delegation' of duties to [Consolidated]." We agree, and focus on the question of whether Mr. Park has shown that his case comes within an exception to *Privette*.

## *PRIVETTE*, *TOLAND* AND THEIR PROGENY

*Privette* begins by stating the common law rule: "At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work. [Citations.]" (*Privette v. Superior Court, supra,* 5 Cal.4th 689, 693.) The court explained the development of the rule: "Over time, the courts have, for policy reasons, created so many exceptions to this general rule of nonliability that ' " 'the rule is now primarily important as a preamble to the catalog of its exceptions.' " ' [Citations.] One of these exceptions pertains to contracted work that poses some inherent risk of injury to others. This exception is commonly referred to as the doctrine of peculiar risk." (*Ibid.*)

The court then described the development of the peculiar risk doctrine. It concluded by saying: "[I]n its original form the doctrine of peculiar risk made a landowner liable to innocent bystanders or neighboring property owners who were injured by the negligent acts of an independent contractor hired by the landowner to perform dangerous work on his or her land. In turn, the landowner could sue the contractor for equitable indemnity. [¶] Gradually, the peculiar risk doctrine was expanded to allow the hired contractor's employees to seek recovery from the nonnegligent property owner for injuries caused by the negligent contractor." (*Privette v. Superior Court, supra,* 5 Cal.4th 689, 696.)

Mr. Privette was a homeowner who hired a roofing company to install a new roof on his duplex. An employee of the roofing company, Jesus Contreras, fell off a ladder and was burned by hot tar. He obtained workers' compensation benefits and sued Mr. Privette. Mr. Contreras alleged Mr. Privette was liable either for negligently selecting the roofing company or that Mr. Privette was liable under the peculiar risk doctrine for the injuries to Mr. Contreras that resulted from the roofing company's negligence. Mr. Privette sought writ relief.

The Supreme Court granted a petition for review and agreed with Mr. Privette's argument that "when the person injured by negligently performed contracted work is one of the contractor's own employees, the injury is already compensable under the workers' compensation scheme and therefore the doctrine of peculiar risk should provide no tort remedy, for those same injuries, against the person who hired the independent contractor." (*Privette v. Superior Court, supra,* 5 Cal.4th 689, 696.)

In another passage that is potentially significant here, the court said: "A person held liable under the doctrine of peculiar risk is entitled to equitable indemnity from the independent contractor at fault for the injury. [Citations.] Thus, although peculiar risk is sometimes described as a 'nondelegable duty' rule [citations], it is in effect a form of vicarious liability. [Citations.]" (*Privette v. Superior Court, supra,* 5 Cal.4th 689, 695, fn. omitted.) In a footnote, the court made it clear that "peculiar risk liability is normally premised on the broader rule of vicarious liability for the contractor's negligence. [Citations.]" (*Id.* at p. 695, fn. 2.) Also potentially significant is the court's comment that "to impose vicarious liability for tort damages on a person who hires an independent contractor for specialized work would penalize those individuals who hire experts to perform dangerous work rather than assigning such activity to their own inexperienced employees. [Citations.]" (*Id.* at p. 700.)

The court concluded: "Therefore, when considered in light of the various goals that the workers' compensation statutes seek to achieve, our conclusion in *Woolen v. Aerojet General Corp.* [1962] 57 Cal.2d 407 [20 Cal.Rptr.

12, 369 P.2d 708], that peculiar risk liability should extend to the employees of the independent contractor, does not withstand scrutiny. Moreover, such a broad extension of the doctrine of peculiar risk is inconsistent with the approach taken by a majority of jurisdictions, and with the view expressed by the drafters of the Restatement Second of Torts." (*Privette v. Superior Court, supra,* 5 Cal.4th 689, 701-702, fn. omitted.) Accordingly, the peculiar risk doctrine did not allow Mr. Contreras to seek damages from Mr. Privette when Mr. Contreras had already been compensated by workers' compensation benefits for the same injury. (*Ibid.*)

Under *Privette,* therefore, the peculiar risk doctrine does not allow "the employee to seek recovery of tort damages from the person who hired the contractor but did not cause the injuries." (*Privette v. Superior Court, supra,* 5 Cal.4th 689, 702.)

Following *Privette* a controversy arose as to its scope. Some appellate courts found that it barred recovery only in cases brought under the peculiar risk theory embodied in the Restatement Second of Torts, section 416. Other appellate courts held that it also applied to the theory of peculiar risk stated in section 413.[2] (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, 257, 262-264.) In *Toland,* our Supreme Court held that *Privette* applied to both theories of peculiar risk.

Mr. Toland was working for a framing contractor when a wall under construction fell on him. He received workers' compensation benefits and sued Sunland, the owner and general contractor. He argued that raising the wall created a peculiar risk of injury and that Sunland should have required its subcontractors to take special precautions. (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, 257.)

Our Supreme Court described the doctrine of peculiar risk and its embodiment in the Restatement Second of Torts, sections 413 and 416. "Under the doctrine of peculiar risk, one injured by inherently dangerous work performed by a hired contractor can seek tort damages from the person who hired the contractor. [Citation.]" (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, 258.) It pointed out that the rule of section 413 is sometimes described as a rule of direct liability because it "rests the liability of the hiring person on his or her omission to provide for special precautions

---

[2]The Supreme Court characterized section 416 as applicable to the situation in which the hiring person is liable for a contractor's negligence in spite of providing that the contractor should take special precautions, and section 413 as applicable when the hiring person fails to provide for special precautions and the contractor's negligence causes injury. (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, 257.)

in the contract or in some other manner . . . ."[3] (18 Cal.4th at p. 259.) The court characterized section 416, on the other hand, as providing a rule of vicarious liability: "As the introductory note to this section explains, 'the [hiring person] is under a duty which he is not free to delegate to the contractor.' (Rest.2d Torts, ch. 15, topic 2, Introductory Note, p. 394; see also *Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 255 [66 Cal.Rptr. 20, 437 P.2d 508] [describing section 416 as imposing a 'nondelegable duty to exercise due care'].)"[4] (*Toland,* at p. 260.)

After describing *Privette* and the subsequent Court of Appeal cases, our Supreme Court addressed the issue of whether *Privette* applied to cases brought under section 413. It noted that, under both sections, "the hiring person is subject to liability for injuries to others resulting from the contractor's failure to take safety precautions while performing the inherently dangerous work. [¶] . . . Thus, under both sections 413 and 416, the hiring person's liability is cast in the form of the hiring person's breach of a duty to see to it that special precautions are taken to prevent injuries to others; in that sense, the liability is 'direct.' " (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, 264-265.)

The Supreme Court then explained why a simple distinction between direct and vicarious liability cannot be used to differentiate the two overlapping sections. (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, 266.) The court reaffirmed that *Privette* applies to bar suits by the contractor's employee against the person hiring the contractor: "Therefore, under *Privette, supra,* 5 Cal.4th 689, even though a person hiring an independent contractor to do inherently dangerous work can be liable under the peculiar risk doctrine for failing to see to it that a hired contractor take special precautions to protect neighboring property owners or innocent bystanders, such a person has *no* obligation to specify the precautions an independent hired contractor should take for the safety of *the contractor's employees.* Absent an obligation, there can be no liability in tort. [Citations.]" (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, 267.)

---

[3]Restatement Second of Torts, section 413 states: "One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer [¶] (a) fails to provide in the contract that the contractor shall take such precautions, or [¶] (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

[4]Restatement Second of Torts, section 416 provides: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

The Supreme Court concluded that *Privette* applies to both situations and "[i]n either situation, it would be unfair to impose liability on the hiring person when the liability of the contractor, the one primarily responsible for the worker's on-the-job injuries, is limited to providing workers' compensation coverage." (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253, 267.)

■ As noted above, Burlington contends that these cases are dispositive. It hired Consolidated, a hazardous waste disposal company, to dispose of Burlington's hazardous waste, and it argues that it had no obligation to specify the precautions Consolidated should take to protect its own employees.

■ Mr. Park relies on two more recent Supreme Court cases to support his contention that Burlington is liable because its own direct negligence caused his injuries.[5] In *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081], the court confronted the issue of whether the injured employee of a contractor could sue the hirer of the contractor for the tort of negligent exercise of retained control, as set forth in the Restatement Second of Torts, section 414.[6] The court held that "a hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but that a hirer is liable to an employee of a contractor insofar as a hirer's exercise of retained control *affirmatively contributed* to the employee's injuries." (*Hooker,* at p. 202; see also *Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28 [87 Cal.App.4th 28, 103 Cal.Rptr.2d 594].[7]) The court went on to hold that, under the facts there, summary judgment was appropriate because the "plaintiff failed to raise triable issues of material fact as to whether defendant actually exercised the retained control so as to affirmatively contribute to the death of plaintiff's husband." (*Hooker, supra,*

[5]Mr. Park also cites *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235 [108 Cal.Rptr.2d 617, 25 P.3d 1096], in which our Supreme Court held that *Privette* and *Toland* bar an employee of an independent contractor from bringing a negligent hiring action against the hirer of the contractor, as set forth in the Restatement Second of Torts, section 411.

[6]Restatement Second of Torts, section 414 provides: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

[7]*Kinney* noted that *Privette* and *Toland* indicated, by their reliance on portions of a tentative draft of the Restatement, that the entire chapter of the Restatement devoted to the liability of an employer of an independent contractor (§§ 410-429) may be inapplicable to employees of a subcontractor. (*Kinney v. CSB Construction, Inc., supra,* 87 Cal.App.4th 28, 35-36.) The rationale is that a person who employs a subcontractor should not be subject to greater liability than the subcontractor and the subcontractor's liability is, of course, limited to workers' compensation benefits. (*Privette v. Superior Court, supra,* 5 Cal.4th 689, 699-700.)

at p. 215.) Mr. Park emphasizes our Supreme Court's interesting definition of "affirmatively contributed": "Such affirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Id.* at p. 212, fn. 3.)

In the companion case of *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219 [115 Cal.Rptr.2d 868, 38 P.3d 1094], our Supreme Court held that "a hirer is liable to an employee of an independent contractor insofar as the hirer's provision of unsafe equipment affirmatively contributes to the employee's injury." (*Id.* at p. 222, fn. omitted.)

Mr. Park also cites *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120 [120 Cal.Rptr.2d 251]. In that case, our colleagues in Division 3 held that "the *Privette/Toland* rationale leaves room for a cause of action against a property owner or a general contractor based on a theory of direct negligence." (*Ray,* at p. 1123.) *Ray* considered the recent cases as set forth above, and concluded that "a direct negligence cause of action may be maintained against the hirer of an independent contractor without running afoul of *Privette* and *Toland.*" (*Ray,* at p. 1128.) A direct cause of action is the only remaining possibility because "the *Privette-Toland* rule stands for the proposition that hirers of a subcontractor are not vicariously liable for injuries to the subcontractor's own employees. [Citations.]" (*Zamudio v. City and County of San Francisco* (1999) 70 Cal.App.4th 445, 450-451 [82 Cal.Rptr.2d 664].)

 To summarize, plaintiff cannot recover on the peculiar risk theory under *Privette* and *Toland* (Rest.2d Torts, §§ 413, 416). Under *Hooker*, Mr. Park can recover on a retained control theory (Rest.2d Torts, § 414) if he can show that Burlington's exercise of retained control affirmatively contributed to his injuries.[8] Under *McKown*, Mr. Park may also recover if Burlington's unsafe equipment affirmatively contributed to his injuries. Finally, under *Ray*, Mr. Park may prevail on a direct negligence theory.[9]

---

[8]The trial court acknowledged the possibility of liability under this theory but commented: "In this case, it doesn't appear that [it is a] very viable [theory] because it doesn't appear that the railroad negligently exercised any retained control or that [it] really had significant retained control." Subsequently, the trial court expressed the opinion that there was no Restatement section 414 liability in this case.

[9]The trial court relied on *Grahn v. Tosco Corp.* (1997) 58 Cal.App.4th 1373 [68 Cal.Rptr.2d 806], but that case was subsequently disapproved by *Hooker.* (*Hooker v. Department of Transportation, supra,* 27 Cal.4th 198, 214.)

With this background, we examine the theories of recovery advanced by Mr. Park and the evidence to support them.[10]

## THE APPLICABILITY OF *PRIVETTE* AND ITS PROGENY TO THE FACTS

Mr. Park contends that the *Privette* doctrine does not bar his action for three independent reasons. First, he argues that Burlington had a nondelegable duty to package the batteries for transport so they would not explode. Second, he argues that Burlington was directly negligent because it failed to remove the battery leads or otherwise decommission the batteries before offering them for transport. Third, he argues that Consolidated was an agent, not an independent contractor, and that Burlington owed a duty to him as the employee of its agent.

### 1. *The Nondelegable Duty Theory.*

Any liability of Burlington must necessarily be based on the existence of a duty to Mr. Park. Mr. Park finds such a duty in the hazardous waste statutes, and he contends that Burlington could not relieve itself of the duty by contracting with Consolidated to deal with its hazardous waste.

Under the hazardous waste statutes and implementing regulations, a generator of hazardous waste is responsible for the proper disposal of that waste. The primary federal statute is the Resource Conservation and Recovery Act (RCRA). (42 U.S.C. § 6901 et seq.) RCRA provides for a manifest system "to assure that all such hazardous waste generated is designated for treatment, storage, or disposal in, and arrives at, treatment, storage, or disposal facilities . . . for which a permit has been issued . . . ." (42 U.S.C. § 6922(a)(5).) RCRA is administered by the Environmental Protection Agency (EPA) and its regulations are found at 40 Code of Federal Regulations part 261 et seq. (2002).

Under a prior law, the Hazardous Materials Transportation Act of 1975 (49 U.S.C. §§ 1801-1812), the Department of Transportation had established a manifest system for the transportation of hazardous waste, and it had issued detailed regulations for such transportation. (49 C.F.R. §§ 172, 173, 178 & 179 (2002).) Accordingly, the EPA regulations adopted a number of the Department of Transportation (DOT) regulations on the same subjects. (40 C.F.R. § 263.10, note (1997).)

---

[10]Mr. Park states that he tried his case on three theories: (1) a theory that Burlington exercised its retained control in a manner that affirmatively contributed to his injuries; (2) a theory that Burlington was negligent in failing to investigate the prior accident involving Jesus Garcia; and (3) the theory that Consolidated acted as the agent of Burlington for purposes of packaging the batteries and signing the manifest.

California also regulates hazardous waste disposal. (Health & Saf. Code, § 25100 et seq.) The California regulations state: "Before transporting hazardous waste or offering hazardous waste for transportation off-site, a generator shall package the waste in accordance with the applicable Department of Transportation regulations on packaging under Title 49 CFR Parts 173, 178, and 179." (Cal. Code Regs., tit. 22, § 66262.30.)

Although the federal regulations are complex, part 173 provides that wet batteries must be packed in certain containers so as to prevent damage and short circuits in transit. (49 C.F.R. § 173.159 (2001).) It also provides that the shipper of hazardous waste is responsible for classifying and describing the waste, and determine that the packaging is an authorized packaging under the regulations. (49 C.F.R. § 173.22 (1999).) Part 178 contains specifications for packaging and part 179 deals with specifications for tank cars.

The federal regulations describe the hazardous waste manifest system. (40 C.F.R. § 262.20 et seq. [EPA regulations]; 49 C.F.R. § 173 et seq. [DOT regulations].) The EPA regulations, which are used to track the movement and disposal of hazardous waste, state: "Before transporting hazardous waste or offering hazardous waste for transportation off-site, a generator must package the waste in accordance with the applicable Department of Transportation regulations on packaging under 49 CFR parts 173, 178, and 179." The Department of Transportation regulations provide: "No person may offer, transport, transfer, or deliver a hazardous waste . . . unless [a] . . . hazardous waste manifest . . . is prepared in accordance with 40 CFR 262.20 and is signed, carried, and given as required of that person by this section." (49 C.F.R. § 172.205 (1996).) The shipper (generator) of the waste must prepare the manifest and sign it at the time the waste is offered for transportation. (49 C.F.R. § 172.205(b) (1996).)

In this case, Burlington provided a letter that authorized certain employees of Consolidated, including Mr. McEntee, to sign hazardous waste manifests on behalf of Burlington. Mr. Park therefore argues the railroad had a duty to pack the waste for shipment in accordance with the regulations, and to certify prior to shipping that the waste had been properly packed. Specifically, Burlington had a duty to pack the batteries for shipment so that they could not short circuit in transit. Although Mr. McEntee signed the manifest for Burlington, Mr. Park argues that he did so as its agent and Burlington therefore certified that "the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packed, marked, and labeled, and are in all respects in proper condition for transport by highway according to applicable international and national government regulations."

Mr. Park further argues that the duties of a generator of hazardous waste, as stated in the statutes and regulations, were nondelegable. Thus, he finds that Burlington had a nondelegable duty to prepare the batteries for shipment so they would not short circuit in transit.

Mr. Park relies on the definition of nondelegable duty in *Maloney v. Rath* (1968) 69 Cal.2d 442 [71 Cal.Rptr. 897, 445 P.2d 513, 40 A.L.R.3d 1]. In *Maloney*, the brakes on defendant's car failed and an automobile accident resulted. Since the Vehicle Code requires a car to be equipped with adequate brakes in good working order, defendant's failure to comply with the Vehicle Code led to a presumption of negligence. Defendant offered sufficient evidence to rebut the presumption of negligence by showing that the brakes had been repaired twice shortly before the accident. (*Id.* at p. 444.) The court found that the duty to exercise reasonable care to maintain the brakes as required by the Vehicle Code was a nondelegable duty. (*Id.* at p. 446.) The court said: "Unlike strict liability, a nondelegable duty operates, not as a substitute for liability based on negligence, but to assure that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm and who may therefore properly be held liable for the negligence of his agent, whether his agent was an employee or an independent contractor." (*Ibid.*) The court cited the Restatement Second of Torts, sections 423 and 424.[11]

Mr. Park cites and applies the factors stated in the following passage: "Both of these sections [423 and 424] point to a nondelegable duty in this case. The statutory provisions regulating the maintenance and equipment of automobiles constitute express legislative recognition of the fact that improperly maintained motor vehicles threaten 'a grave risk of serious bodily harm or death.' The responsibility for minimizing that risk or compensating for the failure to do so properly rests with the person who owns and operates the vehicle. He is the party primarily to be benefited by its use; he selects the contractor and is free to insist upon one who is financially responsible and to demand indemnity from him; the cost of his liability insurance that distributes the risk is properly attributable to his activities; and the discharge of the

[11]Restatement Second of Torts, section 423 states: "One who carries on an activity which threatens a grave risk of serious bodily harm or death unless the intrumentalities used are carefully constructed and maintained, and who employs an independent contractor to construct or maintain such instrumentalities, is subject to the same liability for physical harm caused by the negligence of the contractor in constructing or maintaining such instrumentalities as though the employer had himself done the work of construction or maintenance."

Restatement Second of Torts, section 424 provides: "One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."

duty to exercise reasonable care in the maintenance of his vehicle is of the utmost importance to the public. [Citation.]" (*Maloney v. Rath, supra,* 69 Cal.2d 442, 448.)

The trial court found the case persuasive and so do we. We agree with Mr. Park that the hazardous waste disposal statutes and regulations impose nondelegable duties on the generator of hazardous waste to see that the waste is properly disposed of. Burlington was therefore under a nondelegable duty to see that its used storage batteries were properly disposed of, and it cannot avoid that duty by hiring an independent contractor to do the disposal work. Burlington is still liable for the harm caused by the negligence of its chosen contractor, just as the motorist is responsible for an accident caused by the negligent work of the motorist's mechanic. But the fact that the duty is nondelegable does not necessarily mean that Burlington is liable to Mr. Park, an employee of the contractor, for injuries caused by the contractor's negligence.[12]

Mr. Park cites *Felmlee v. Falcon Cable TV* (1995) 36 Cal.App.4th 1032 [43 Cal.Rptr.2d 158]. In that case, a cable television repair man was injured while repairing a cable television line. He sued the general contractor who hired his employer for breach of a nondelegable duty, specifically the duty to adhere to certain Public Commission rules and to a county ordinance regarding industry standards and the maintenance of safe working conditions. (*Id.* at pp. 1034-1036.) He argued that the doctrine of nondelegable duties survived *Privette*. The appellate court agreed. It said: "A nondelegable duty is a definite affirmative duty the law imposes on one by reason of his or her own relationship with others. One cannot escape this duty by entrusting it to an independent contractor. [Citation.]" (*Felmlee,* at p. 1036.) The court held that "*Privette* does not purport to abolish all forms of vicarious liability in general, or the doctrine of nondelegable duty in particular, as a basis for suits by employees of contractors against the contractors' employer. . . . Although an injured worker who obtains workers' compensation may not sue a general contractor for a peculiar risk, such a worker may sue the general contractor for specific, nondelegable duties in certain cases. [¶] Nondelegable duties may arise when a statute provides specific safeguards or precautions to insure the safety of others. [Citation.]" (*Felmlee,* at pp. 1038-1039.).

In *Lopez v. University Partners* (1997) 54 Cal.App.4th 1117 [63 Cal.Rptr.2d 359], Mr. Lopez was injured while working in a trench when its

---

[12]We note that the case was not tried on a nondelegable duty theory, and such a theory was not presented to the jury. Accordingly, the jury did not find that a nondelgable duty was actually breached, or that any such breach caused plaintiff's injuries. Instead, the trial court relied on the theory in deciding posttrial motions and it ultimately decided that any error was harmless and did not work to the disadvantage of the railroad. The case was tried on the theory that Burlington was itself negligent.

walls collapsed. (*Id.* at p. 1121.) He sued the owner of the property and its lessee, who was also the general contractor. (*Id.* at p. 1120.) Applying *Privette*, the trial court found that the owner was not vicariously liable under the peculiar risk doctrine and granted defendants' motion for summary judgment. The appellate court agreed that Mr. Lopez could not recover under the peculiar risk doctrine. (*Lopez,* at p. 1125.) It then considered whether the owner and lessee owed Mr. Lopez nondelegable duties to provide a reasonably safe workplace and to exercise due care because the trench excavation was an ultrahazardous activity. The first contention rested on the Restatement Second of Torts, section 414. (*Lopez,* at p. 1126.) As discussed above, that issue was subsequently determined in *Hooker*. The *Lopez* appellate court found that neither section 414 nor a retained control theory was applicable because Mr. Lopez had not made a sufficient evidentiary showing to create a triable issue of fact on either theory. (*Lopez,* at p. 1126.)

The court also rejected the ultrahazardous activity argument, finding that it was precluded by *Privette*: "This contention is without merit as it is merely another way of arguing that [the owner] is liable under the peculiar risk doctrine." (*Lopez v. University Partners, supra,* 54 Cal.App.4th 1117, 1126.) The court found that *Felmlee* involved a claim of a nondelegable duty imposed by statute and it therefore did not support a claim that the owner owed a duty to the employees of a contractor who was hired to perform an ultrahazardous activity. (*Id.* at p. 1129, fn. 7.)

Since *Maloney, Felmlee* and *Lopez* were decided before *Toland* and the other more recent cases summarized above, we must apply the current test stated in *Hooker* to both situations, i.e., to the claim of a nondelegable duty imposed by statute (*Felmlee*) and to a claim based on ultrahazardous activity (*Lopez*). Under *Hooker*, a retained control over safety conditions at the worksite does not support liability unless plaintiff proves that the exercise of such retained control affirmatively contributed to the employee's injuries. (*Hooker v. Department of Transportation, supra,* 27 Cal.4th 198, 202.)

We therefore find that, although the duties imposed on the generator of hazardous waste by statute and regulation are nondelegable duties that survive *Privette*, the generator is not liable to the employee of a subcontractor who is employed to dispose of the hazardous waste unless it is shown that the generator's conduct affirmatively contributed to the employee's injuries. We apply that test to the facts of this case.

2. *The Direct Negligence Theory.*

We next turn to the question whether the evidence here was sufficient to show that the actions of Burlington affirmatively contributed to Mr. Park's injuries.

Mr. Park first asserts that Burlington's conduct affirmatively contributed to his injuries because the railroad was directly negligent in failing to decommission the batteries before transport. He relies on the fact that the jury found that Burlington was "negligent in preparing or offering for transport the hazardous waste involved in plaintiff's incident" and that Burlington's negligence was a cause of Mr. Park's injuries. Mr. Park therefore concludes that "a jury could reasonably conclude that [Burlington] was actively negligent in preparation of and offering of the batteries for transport and this negligence affirmatively contributed to Park's injuries."

We must disagree. The undisputed evidence was that railroad employees collected used signal batteries in central locations for pickup by Consolidated's employees. The batteries were packed in totes, not sealed drums, and there was no evidence that the railroad's packaging was inadequate. Although the leads remained on the batteries in many cases, there was no danger of explosion because the railroad employees did not pack the batteries in drums. We agree with Burlington: "In fact, the accident would not have occurred if Consolidated Waste had simply transported the batteries in the plastic totes that Burlington Northern had left them in. Unlike the sealed drum that Consolidated Waste selected for use, the totes were open at the top and thus provided ample ventilation for the hydrogen released by the batteries."

It was Consolidated that repackaged the batteries for shipment in airtight drums without removing the battery leads. Even if the packaging of the waste batteries in drums was authorized by the federal regulations, the failure to pack the batteries to prevent short circuits in transit was a violation of the regulations that clearly caused Mr. Park's injuries. In any event, the undisputed repackaging of the batteries into drums by Consolidated, without removing the leads, must be viewed as a legally superseding cause of Mr. Park's injuries. (Rest.2d Torts, §§ 440 et seq., 447, 452, com. b, illus. 2, p. 487.)

We therefore agree with Burlington that the jury's finding that Burlington was a legal cause of Mr. Park's injuries is not supported by the evidence. The only conclusion supported by the evidence is that Burlington employed Consolidated, a hazardous waste disposal company, to properly dispose of Burlington's hazardous waste, and Mr. Park's injuries were caused by Consolidated's failure to do so, i.e., by negligently packing the batteries into sealed drums without removing the leads from the batteries.

3. *The Agency Theory.*

Mr. Park also asserts that Burlington's conduct affirmatively contributed to his injuries because the actions of Mr. McEntee, as an authorized agent of

Burlington, are attributable to Burlington. As noted above, Burlington authorized Mr. McEntee to sign hazardous waste manifests on its behalf, and he did so. The manifests declared that the hazardous waste had been properly packaged for shipment.

Mr. Park relies on Civil Code section 2338: "Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal."

Mr. Park points out that the jury found that Consolidated was acting as an agent of Burlington, rather than an independent contractor, for the purpose of signing the generator's certification on the waste manifest, and that it was negligent in doing so. However, the jury also found that Consolidated was not acting as an agent of Burlington for purposes of preparing or packaging the batteries for transport.

While an issue of verdict consistency arises from these findings, Mr. Park distinguishes between the work of an independent contractor and the work of an agent by applying the retained control test set forth in BAJI No. 13.20. The jury was given this instruction and accordingly it was told that "[t]he most important factor in determining whether one is an agent or independent contractor is whether the principal has the right to control the manner and means of accomplishing the result desired." (BAJI No. 13.20.) The jury found that Consolidated was an agent for signing the manifest and an independent contractor for the packaging of the batteries. Although it was the packaging of the batteries in drums that led to Mr. Park's injuries, Mr. Park attempts to construct liability on the theory that the signing of the manifest was an assertion that the batteries had been packed properly and the railroad negligently exercised its retained control in a manner that injured him. In other words, he argues that the railroad is directly responsible for the torts of its agent, Consolidated, because it authorized and ratified them.

We disagree. Even if we assume the duties of Consolidated to pick up and pack the batteries for shipment can be divided so that Consolidated was an agent for purposes of signing the manifests and an independent contractor for purposes of packing the batteries for shipment, Mr. Park's injuries were obviously caused by the negligent packing of the drums, not by the certification that they had been properly packed. As discussed above, *Hooker*'s retention of control theory applies if Mr. Park can show that Burlington's exercise of retained control affirmatively contributed to his injuries. No such

affirmative contribution is shown by the fact that Burlington authorized Mr. McEntee to sign hazardous waste manifests on its behalf, even though he did so negligently.

Although the parties have not cited any case in which the *Privette* rationale was applied to an agent instead of an independent contractor,[13] the difference between an agent and an independent contractor is primarily the degree of retained control. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1579 [36 Cal.Rptr.2d 343].)[14] Accordingly, even if there was sufficient retained control to make Consolidated an agent rather than an independent contractor, the appropriate test for all retained control situations is that stated in *Hooker*: "[I]f a hirer does retain control over safety conditions at a worksite and negligently exercises that control in a manner that affirmatively contributes to an employee's injuries, it is only fair to impose liability on the hirer." (*Hooker v. Department of Transportation, supra,* 27 Cal.4th 198, 213.)

The issue then is whether Burlington's posited retained control over the signing of the hazardous waste manifest was exercised in a manner that contributed to Mr. Park's injuries.[15] Mr. Park finds such evidence in Burlington's failure to investigate the prior incident involving Mr. Garcia and to take corrective action. However, the argument neglects the fact that the jury found that, although Burlington's omissions in failing to investigate or take corrective action as a result of the Garcia incident were negligent, the negligence was not a cause of Mr. Park's injuries. Since substantial evidence supports that conclusion, it cannot be said that Burlington's failure to investigate the prior incident affirmatively contributed to Mr. Park's injuries. The situation is analogous to the situation in *Hooker*, in which the employer retained control over worksite safety but did nothing to affirmatively contribute to the employee's injuries. In such a case, "because the liability of the contractor, the person primarily responsible for the worker's on-the-job injuries, is limited to providing workers' compensation coverage, it would be unfair to impose tort liability on the hirer of the contractor merely because

---

[13]The agency issue was present in *Ray*, but the court did not need to address it. (*Ray v. Silverado Constructors, supra,* 98 Cal.App.4th 1120, 1136.)

[14]Of course, an agent may also be an independent contractor. (*City of Los Angeles v. Meyers Bros. Parking System, Inc.* (1975) 54 Cal.App.3d 135, 138 [126 Cal.Rptr. 545].)

[15]Another way of viewing the issue is under the doctrine that the principal is liable for the torts of the agent committed while the agent is acting within the scope of his or her employment, under respondeat superior principles. (See generally 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 115, p. 109.) From this perspective, the negligence of Mr. McEntee in signing the manifest is attributable to Burlington, and the issue is whether that action affirmatively contributed to Mr. Park's injuries. But, despite the jury's causation finding, there is no evidence that Mr. Park read or relied on the manifest before he moved the drum that exploded. Mr. Park testified that he did not customarily look at a waste manifest before moving a drum.

the hirer retained the ability to exercise control over safety at the worksite. In fairness, as the *Kinney* court recognized, the imposition of tort liability on a hirer should depend on whether the hirer *exercised* the control that was retained in a manner that *affirmatively* contributed to the injury of the contractor's employee." (*Hooker v. Department of Transportation, supra,* 27 Cal.4th 198, 210.)

Mr. Park also cites testimony that Burlington was informed of the packing methods used by Consolidated, and that Burlington therefore knew, by receipt of the signed manifests, that Consolidated was certifying batteries for transport that were not safely packaged for transport. Again, the argument fails because Mr. Park has not shown that Burlington affirmatively exercised its retained control.[16]

We therefore conclude that Mr. Park has not stated a legal theory that establishes the inapplicability of *Privette* and its progeny. Mr. Park has not shown that any direct negligence of Burlington caused his injuries, and he fails to pass the *Hooker* test by proving that the railroad did anything which affirmatively contributed to his injuries.[17] Nor has he shown the existence of any other theory of vicarious liability that is allowable under *Privette* and *Toland.*[18]

In summary, Burlington hired a licensed hazardous waste disposal company to properly dispose of its hazardous waste. Although Burlington remained ultimately responsible for such disposal, the overwhelming evidence of Consolidated's negligence cannot lead to Burlington's liability for the entire verdict without a showing that Burlington did something to affirmatively contribute to Mr. Park's injuries. We are required by our Supreme Court's decisions in *Privette, Toland* and *Hooker* to find that Burlington is not liable for the injuries to Mr. Park, the employee of Burlington's independent contractor.

"When an employee of the independent contractor hired to do dangerous work suffers a work-related injury, the employee is entitled to recovery under the state's workers' compensation system. That statutory scheme,

---

[16]*Hooker* recognizes that, in an appropriate case, a hirer's omissions may lead to liability. It gives the example of a hirer that promises to undertake a safety measure and negligently fails to do so, thus causing injury to the contractor's employee. (*Hooker v. Department of Transportation, supra,* 27 Cal.4th 198, 212, fn. 3.) No such omission has been shown here.

[17]As noted above, the case was tried on a direct negligence theory. The jury was not instructed on a retained control theory and did not make any findings regarding it.

[18]In places, Mr. Park's argument comes close to an argument that Burlington should not have hired or retained an incompetent hazardous waste disposal company such as Consolidated. However, as noted above, a negligent hiring theory under the Restatement Second of Torts, section 411 is foreclosed by *Camargo v. Tjaarda Dairy, supra,* 25 Cal.4th 1235.

which affords compensation regardless of fault, advances the same policies that underlie the doctrine of peculiar risk. Thus, when the contractor's failure to provide safe working conditions results in injury to the contractor's employee, additional recovery from the person who hired the contractor—a nonnegligent party—advances no societal interest that is not already served by the workers' compensation system." (*Privette v. Superior Court, supra,* 5 Cal.4th 689, 692.)

DISPOSITION

The judgment is reversed. Burlington is to recover its costs on appeal.

McKinster, J., and Richli, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 30, 2003. George, C. J., and Brown, J., did not participate therein.